THE CITY OF ATLANTA *vs.* DOOLY, surviving partner.

1. The city of Atlanta, after licensing a firm to do business as bill-posters within its limits, on the *ex parte* application of a few citizens, caused one of their bill-boards to be torn down and destroyed, without affording the firm an opportunity to be heard, and in effect paying no attention to their remonstrances when the order was about to be carried out. The municipal authorities rejected an offer to adjust the losses of their licensees by restoring their bill-board, or allowing them to do so, and remunerating them for a contract which they had secured and which they were compelled to relinquish:

*Held*, that a verdict for the plaintiffs for damages on account of such a tort was proper, and the amount found was very small.

2. There was no error in the charges or refusals to charge, of which the defendant could complain. The charge was quite as favorable to it as it had a right to expect.

3. Evidence that certain theatrical and circus companies would have used the bill-board, and what they would have paid therefor, was properly admitted.

4. There was nothing in the motion to non-suit or to disallow the amendments to the declarations.

5. Where a suit was brought by partners for damages on account of the destruction of property belonging to the firm, and pending the

case, one of the partners died, there was no error in granting an order allowing the case to proceed in the name of the survivor. April 2, 1885.

Torts. Municipal Corporations. Damages. Non-suits. Partnership. Before Judge HAMMOND. Fulton Superior Court. September Term, 1884.

Kries & Dooly, as partners in the business of bill-posting, sued the city of Atlanta for $2,500.00, for the destruction of a bill-board and the loss profits in displaying advertisements of theaters, shows, circuses and patent medicines. Kries died before the trial, and an order was taken allowing the case to proceed in the name of M. J. Dooly as surviving partner. Defendant having demurred to the declaration, plaintiff amended, averring that the city tore down the bill-board under its general power to abate nuisances, but without complying with the law in respect thereto.

The evidence for the plaintiff was, in brief, as follows: On a petition of certain citizens and a report of the committee on fire department, the city council ordered a bill-board, belonging to Kries & Dooly, to be torn down, and the chief of police caused this to be done under a note from the clerk of council requesting him to do so. The owners of the board petitioned the council to replace it, or allow it to be replaced, and to pay them $125.00 damages. This was referred to the committee of council on contested claims and litigation, but was never granted. The same advance agents of shows generally come through the country each season, and they knew of this bill-board. On the subject of the damages incurred, the plaintiff testified, in brief, as follows:

The bill-board was worth and would cost $125.00. It was a structure of planks nailed to posts, fronting on Whitehall and Fair streets, in this city. Kries made most of the contracts, and before his death sold out all rights in the partnership, including this bill-board, to his wife. We lost $125.00 from Sells Brothers' circus. Mr. Sells

said that was what he would have paid if the board had been standing. We had a letter from Sells' agent before the board was taken down, requesting us to save all the boards in the city for them.   It was the best board we had in town.   We had some others here where we posted up these placards.   The board was torn down in September, 1883, and the loose lumber left on the ground.   Negroes and others came and carried some of it away for firewood, and a fence was built from some of it.   We made no attempt to replace it ourselves, but petitioned the city council for $125.00, and the council to put it back.   In the spring of 1884, 60 to 64 theatrical companies came to Atlanta.   They would all have used that board.   I can't give the names of the companies, but we would have made from $4.00 to $5.00 from each of said companies.   I always lay out the paper.   Most of these companies asked for that board.   I would have used it, if they had not asked for it.   By not having the board to paste the posters on, we lost about $4.00 on each company.   In addition, we lost $100.00, I think, on Dr. Carver's Indian show.   They paraded through the streets.   We advertised Carver elsewhere, and he would have paid us $100.00 more if we could have used this board.   Don't remember what Carver did pay us.   We tried to stop them from tearing down the board.   We went to see Mayor Goodwin, at his office, about it.   He was absent from the city; but we did see him later on, and he telephoned to police headquarters, if the board had not been torn down, to postpone it until Monday.   The answer came that they were then tearing it down.   Mr. Kries went to where the bill-board was torn down.   I did not go out there for a month   We went out there before the removal of the bill-board, and stopped up all the holes that little negro boys would crawl under and cause complaint by the neighbors.

*Cross-examined :* We had no special contract in writing with any of these shows or companies.   They made the contracts with Mr. DeGive, at the opera house.   We had

FEBRUARY TERM, 1885. 705

The City of Atlanta vs. Dooly, surviving partnr.

a contract with Mr. DeGive, to furnish him such space as he wanted, and to do all his bill-posting. The agents of the theatrical companies would lay out the paper, and we would put it up, and Mr. DeGive would pay us for it. We made contracts with four or five of the companies, who rented the opera house, themselves. I can't tell how much any one show or troupe paid us. Mr. Kries made a special contract with Sells Brothers' circus, but I was not present. I made the contract with Dr. Carver's Indian show, or his agent. I posted all the bills he gave me to put up. On passing the place where the bill-board formerly stood, Dr. Carver's agent said if he could advertise on that bill-board now, he would give us $100.00 more. This was before they posted his bills. . I suppose it would have cost $75.00 to replace the bill-board after it was torn down.

*Re-direct:* Mr. DeGive had nothing to do with the board, and it made no difference whether he knew it was there or not. The agents selected the boards and, as near as I can judge, we lost $4.00 on each company. Kries & Dooly were licensed bill-posters, and paid their license fee to the city.

The chairman of the committee on contested claims and litigation, a witness for the defendant, testified that no report had been made, but it was understood that the suit might be brought, and if the matter should be settled, the suit should be dismissed. He also stated that he had no idea of making a favorable report on the petition. In addition to this, the evidence on behalf of the defendant showed that the board could have been constructed in a day; that it was made of old, second-hand lumber, and the cost of the labor of replacing it would be about $15.00.

Defendant also introduced L. DeGive, who testified, in brief, as follows : I made the contracts with Kries & Dooly to post bills for all companies playing in my opera house. The agents of the troupes would go to them and arrange for the posting, and I would pay the bills. I never saw,

v 74-45

and knew nothing of, this bill-board on Whitehall and Fair streets.

The jury found for the plaintiff $300.00. Defendant moved for a new trial, on substantially the following grounds:

(1.) Because the court allowed this amendment: " Said mayor and general council assuming to act under the law authorizing the abatement of nuisances, but not complying in any particular with it."

(2.) Because the court allowed the amendment that " the city of Atlanta seized the said lumber, appropriating it to its own use and deriving a benefit therefrom."

(3.) Because the court ordered the case to proceed in the name of M. J. Dooly as surviving partner.

(4.) Because the court refused a non-suit.

(5.) Because the court refused to charge to the effect that it was the duty of Kries & Dooly to replace the bill-board themselves, and exercise all proper and reasonable efforts to lessen the damages. [The court charged that a person damaged was bound to do what he could to prevent or lessen the damages.]

(6.) Because the court charged that, if the city tore down the bill-board once, Kries & Dooly had the right to presume the city would tear it down again if they should replace it.

(7.) Because the court admitted Dooly's evidence as to the Sells Brothers' contract, and as to the theatrical companies, not giving the names of the companies or persons with whom the contracts were or could have been made; and also in allowing Dooly to testify that all the companies that came here that winter would have used that board, on which he would have made $4.00 from each company; and also in permitting Dooly to swear as to the Carver contract.

The motion was overruled, and the defendant excepted.

E. A. ANGIER; J. T. PENDLETON, for plaintiff in error.

JOHN MILLEDGE; W. T. NEWMAN, for defendant.

HALL, Justice.

This was an action against the city of Atlanta to recover damages for tearing down and destroying, without lawful cause or authority, a certain bill-board, the property of plaintiffs, who were partners in the business, and were duly licensed bill-posters under the ordinances of said city.

Pending the suit, one of the plaintiffs died, and an order was taken allowing it to proceed in the name of the survivor. The trial resulted in a verdict in favor of the plaintiff for three hundred dollars, and thereupon the defendant moved for a new trial, upon various grounds, which was overruled by the court, and the judgment overruling this motion is brought here upon bill of exceptions and writ of error for review.

1. We have seldom seen a more unauthorized and wanton invasion of private rights by a municipal corporation than this record presents, or one in which it has been permitted to escape with such inadequate damages for the injury inflicted; the verdict returned does not amount to one-half of the actual damage the plaintiffs were shown to have sustained by the destruction of their property and the reduction of the profits legitimately resulting from their business, which was interrupted by this ill-advised and hasty action of the city authorities. Although this business was conducted under a license, for which they paid, yet the structure which was necessary to its successful prosecution was, upon the *ex parte* application of a few citizens, ordered by the corporate authorities to be demolished, without affording an opportunity to their licensees to be heard; and when the order was about to be carried into effect, no attention was paid to their remonstrances against the consummation of the wrong about to be done to their property and their rights under the license. Their reasonable proposition to adjust their losses by the city

restoring their bill-board, or allowing them to do so, and remunerating them for a contract which they had secured, amounting to $125, and which they were compelled to relinquish, was rejected. It is evident that, without the permission of the authorities, they could not, without involving themselves in further difficulties, have replaced this bill-board, and that it was not their purpose to allow them to do so.

2. There is no error in the charges, or refusals to charge, at the request of the defendant, of which it has any right to complain; they were fully as favorable to it, and perhaps more so, than it was entitled to under the law, and the merit of its exceptions thereto is not altogether apparent.

3. The evidence to which it objected was not amenable to the complaints made against it, and should not have been, as it was not, repelled, for the reasons urged for its rejection.

4. There was nothing in the motion to non-suit or to disallow the amendments offered to the declarations; these were certainly proper, though they may not have been indispensable to the maintenance of the suit.

5. The remaining question, that the surviving partner could not prosecute the suit for the benefit of the firm, has scarcely enough virtue in it to save the plaintiff in error from damages for bringing this writ of error here.

" When one or more of several parties, jointly interested in the property at the time the injury was committed, is dead, the action," says Chitty (1 Plead., 76), " should be in the name of the survivor, and the executor or administrator of the deceased cannot be joined, nor can he sue separately; and therefore, to an action of trover brought by the survivor of three partners in trade, it cannot be objected that the two deceased partners and the plaintiff were joint merchants, and that, in respect to the *lex mercatoria*, the right of survivorship did not exist, for the legal right of action survives, though the beneficial inter-

est may not." To the same effect, and also as to the right of the survivor to prosecute a joint action, where one of the plaintiffs dies during its pendency, see Dicey on Parties to Actions, 402, 405. In case of death, the surviving partner has the right to control the assets belonging to the firm, to the exclusion of the legal representatives of the deceased partner, he being primarily liable to the creditors of the firm for their debts, and until the interest of the deceased partner in the firm effects is ascertained and his portion is turned over to his representatives, they can maintain no suit for the recovery of the joint effects; after that is done, they have the right to sue in their own name for such choses in action as have been turned over to them. Code, §1907.

Judgment affirmed.